UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

LIBBY BRAUNER, FRANCOIS LEICHTAG, and ANN LEICHTAG,

                              Plaintiffs,

                - versus -

BRITISH AIRWAYS PLC,

                              Defendant.

MEMORANDUM
AND ORDER
12-CV-343 (JG) (JO)

A P P E A R A N C E S :

    STERN & STERN
    50 Court Street
    Brooklyn, NY 11201
By:  David Lyle Stern
    *Attorney for Plaintiffs*

    CONDON & FORSYTH LLP
    7 Times Square
    New York, NY 10036
By:  Anthony U. Battista
    Mary Katherine Dow
    *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        The plaintiffs filed this lawsuit in New York state court, alleging that British Airways PLC ("British Air") failed to honor first-class tickets to London that had been purchased by plaintiff Libby Brauner ("Brauner") for the benefit of Francois Leichtag ("Mr. Leichtag") and his wife, Ann Leichtag ("Mrs. Leichtag"), using credit card reward points. As a result, Mr. and Mrs. Leichtag had to purchase same-day tickets to London and fly in coach class. British Air has neither reimbursed the Leichtags for the cost of their replacement tickets nor returned to Brauner the mileage points she used to purchase the tickets. British Air removed the action to federal

court, and the plaintiffs timely moved to remand to state court on the ground that this court lacks subject matter jurisdiction over the action. Because this court has diversity jurisdiction over the action, the plaintiffs' motion to remand is denied.

## BACKGROUND

A.         *Factual Allegations of the Complaint*

According to the plaintiffs' state-court complaint, Brauner used a Chase credit card that allowed her to accrue air mile points in exchange for making purchases on the credit card. Compl. ¶ 5 (ECF No. 1). At the end of each monthly billing cycle, any air mile points that Brauner had accumulated through using the card were transferred to Brauner's British Airways Air Miles account. *Id.* Brauner's contract specifically provided that she could apply her reward miles to tickets in "any name requested." *Id.* ¶ 25.

On or about June 15, 2011, Brauner used 150,000 of her accumulated air miles to purchase two first-class tickets on British Air flight number 174, traveling from New York, John F. Kennedy Airport to London Heathrow Airport on June 22, 2011. *Id.* ¶ 7. The tickets were purchased in the names of Mr. and Mrs. Leichtag. *Id.* The monetary value of the tickets was approximately $14,000. *Id.* British Air confirmed that the bookings were "confirmed." *Id.* ¶ 9.

However, when Mr. and Mrs. Leichtag arrived at the airport on June 22, 2011, in order to board their flight to London, British Air representatives informed them that their tickets were "invalid." *Id.* ¶ 10. The representatives failed to explain why the tickets had been canceled and refused to speak with Brauner on the phone to resolve the problem. *Id.* ¶¶ 11-12. As a result, Mr. and Mrs. Leichtag were "highly embarrassed and distressed," and were forced to buy two economy-class tickets at a market price of $1,800 in order to board their flight. *Id.* ¶¶ 13-14.

Afterward, British Air froze Brauner's air miles account and removed all of her remaining air miles, which by then totaled 146,351, the monetary value of which was approximately $13,000. *Id.* ¶ 15. Since that date, Brauner continued to use her British Air credit card, further accruing 124,692 air miles, with a monetary value of approximately $11,000, which were also systematically expunged from her account each month. *Id.* ¶ 16. British Air has never returned to Brauner the 150,000 air miles she used to purchase the Leichtags' tickets, nor have they refunded to the Leichtags the $1,800 they expended to purchase their replacement tickets. *Id.* ¶¶ 17-18.

Mr. Leichtag is a prominent Rabbi in the local Orthodox Chassidic community in Brooklyn, New York. *Id.* ¶ 3. The Leichtags allege they were singled out for discriminatory treatment due to their religious beliefs, which were evident to British Air from their appearance and their requests for kosher meals on each occasion that they flew. *Id.* ¶¶ 37-38. In addition, Mr. Leichtag suffers from serious back pain which makes "travel in cramped economy class airplane seats to be extremely uncomfortable." *Id.* ¶ 3. All three plaintiffs suffered emotional distress from the experience, and Mr. Leichtag suffered physical distress as well. *Id.* ¶ 33. In addition, all three plaintiffs' reputations have been irreparably damaged in their religious, business, and social community because of the experience. *Id.* ¶¶ 19, 32.

B.        *Procedural History*

The plaintiffs filed this action in the Supreme Court of the State of New York for the County of Kings on December 7, 2011. *See* Removal Notice ¶ 1 (ECF No. 1). The complaint asserted causes of action for (1) breach of contract, on behalf of Brauner; (2) breach of a third-party contract, on behalf of the Leichtags; (3) an injunction ordering British Air to restore all of Brauner's air miles and a declaratory judgment that all of Brauner's air miles that were

previously removed are valid; (4) negligent or willful defamation of character and intentional infliction of emotional distress; and (5) unlawful discrimination based on religious affiliation in violation of the New York City Human Rights Law and the U.S. Constitution.  Compl. ¶¶ 20-40.  The plaintiffs sought damages totaling roughly $2,285,000,[1] an injunction requiring British Air to restore all of Brauner's air miles to her account, and an award for plaintiffs' legal fees and costs.  *Id.*

British Air was served with the Summons and Verified Complaint on January 6, 2011.  *Id.* ¶ 2.  On January 24, 2012, British Air removed this action to federal court on the asserted grounds of diversity and federal question jurisdiction, the latter of which was premised on this case's arising under Article 17 of the Montreal Convention.[2]  *Id.* ¶ 4.

The plaintiffs filed the instant motion to remand on February 14, 2012.  Remand Mo. (ECF No. 4).  The court has entertained full briefing on the motion, and held oral argument on April 12, 2012.

## DISCUSSION

If the court has either diversity jurisdiction or federal question jurisdiction over this matter, the plaintiff's remand motion must be denied.

A.        *Diversity Jurisdiction*

The Constitution provides that the "judicial Power shall extend" to "Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."  U.S. Const. art. III, § 2.  Pursuant to this constitutional authority, Congress has statutorily extended diversity (and alienage) jurisdiction to federal courts by granting them original jurisdiction over

---

[1] The bulk of this damages request – $2 million – was sought for the religious discrimination claim. Compl. ¶¶ 39-40.

[2] Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on May 28, 1999 (entered into force on Nov. 4, 2003), S. Treaty Doc. No. 106-45, 1999 WL 33292734, 2242 U.N.T.S. 350 (2000) ("Montreal Convention").

civil actions where (1) "the matter in controversy exceeds the sum or value of $75,000," and (2) "is between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Diversity jurisdiction under § 1332 requires complete diversity – that is, no plaintiff may have the same citizenship as any defendant. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806), *overruled on other grounds*, *Louisville, Cincinnati & Charleston R.R. Co. v. Letson*, 43 U.S. (2 How.) 497 (1844). An action is removable to federal court only if it could have been brought there originally. 28 U.S.C. § 1441(a). The burden of persuasion for establishing diversity jurisdiction is borne by the party asserting it – here, the defendant, British Air. *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1194 (2010).

For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." *Id.* § 1332(c)(1).[3] This provision

---

[3] For purposes of this opinion, I will assume that § 1332(c) applies to foreign corporations as well as domestic. Congress amended §1332 to add subsection (c) in 1958. Prior to that amendment, alien corporations were considered citizens solely of the foreign states in which they were incorporated. *See* 13F Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure § 3628 & n.1 (3d ed. 2011). After the 1958 amendment, there has been some dispute over whether §1332(c) applies to foreign as well as domestic corporations – that is, whether a foreign corporation, in spite of its place of incorporation, can be considered a citizen of a U.S. state if its "principal place of business" is located in that U.S. state.

The Second Circuit has never decided whether § 1332(c) applies to alien corporations. *Astra Oil Trading v. PRSI Trading Co. LP*, 794 F. Supp. 2d 462, 467 (S.D.N.Y. 2011). Circuits that have reached this issue, however, have uniformly held that § 1332(c) applies to foreign corporations. *See JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 98 n.3 (2002); *see also Danjaq, S.A. v. Pathe Commc'ns Corp.*, 979 F.2d 772, 773-74 (9th Cir. 1992); *Vareka Invs., N.V. v. Am. Inv. Props., Inc.*, 724 F.2d 907, 909 (11th Cir. 1984), *cert. denied*, 469 U.S. 826 (1984); *Jerguson v. Blue Dot Inv., Inc.*, 659 F.2d 31, 35 (5th Cir. 1981), *cert. denied*, 456 U.S. 946 (1982); *Slavchev v. Royal Caribbean Cruises, Ltd.*, 559 F.3d 251, 254 (4th Cir. 2009) (dictum).

> In the leading case to hold that § 1332(c) applies to foreign corporations, the court explained:
> While it is true that Congress apparently gave no explicit consideration to the effect of the amendment [to § 1332] on alien corporations, our interpretation of its applicability better serves the express Congressional purpose of the amendment which was to limit the diversity jurisdiction of the federal courts. By enacting § 1332(c)[,] Congress sought to preclude any technical finding of diversity, when, in fact, no such diversity existed. When a corporation, while incorporated in another state, maintained its principal place of business in the same state in which its legal adversary was a citizen, it was felt neither to need nor deserve the protection of a federal court from any possible state court bias against an outsider. This rationale is no less compelling when applied to a

"establishes a theory of dual citizenship for corporations and if either the corporation's place of incorporation or principal place of business destroys diversity, then the courts will not have diversity jurisdiction." *Sty-Lite Co. v. Eminent Sportswear Inc.*, 115 F. Supp. 2d 394, 398 (S.D.N.Y. 2000). Recent Supreme Court precedent holds that a corporation's "principal place of business" is "the place where a corporation's officers direct, control, and coordinate the corporation's activities, often called the 'nerve center.'" *Hertz Corp.*, 130 S. Ct. at 1192. "[I]n practice it should normally be the place where the corporation maintains its headquarters . . . ." *Id.* A corporation has only one principal place of business. *Id.* at 1193.

The plaintiffs in this case are all citizens of New York. *See* Compl. ¶ 1 (plaintiffs "resid[e]" in New York); Pls.'s Remand Mo. ¶ 4 ("Plaintiffs assert that . . . Plaintiffs . . . are citizens of New York . . . ."). Therefore, if British Air is also a New York citizen, this court lacks diversity jurisdiction. If, instead, British Air is a citizen of a foreign nation or of a state other than New York, this court has diversity jurisdiction.

The parties agree that British Air is a foreign corporation incorporated in England. *See* Compl. ¶ 4; Removal Notice ¶ 8; Blaney Aff. ¶ 4 (ECF No. 8-1). This, however, does not end the analysis, because a corporation can be a citizen of *both* its state of incorporation and the state in which its principal place of business is located.[4]

---

> corporation which has been chartered in a foreign country but maintains its principal place of business in the United States.
> . . . .
> We hold then that section 1332(c) applies to foreign corporations whose principal place of business is located in the United States.

*Se. Guaranty Trust Co. v. Rodman & Renshaw, Inc.*, 358 F. Supp. 1001, 1007 (N.D. Ill. 1973) (internal footnote omitted); *see also Jerguson*, 659 F.2d at 35 (holding that textual analysis "does not necessitate the conclusion that the principal place of business part of section 1332(c) cannot be applied to alien corporations" and concluding that applying the statute to alien corporations would effectuate Congress's policy of limiting diversity for entities which had no need for federal court protection against bias in the U.S. state where they had chosen to locate their principal place of business).

[4] This proposition again assumes that § 1332(c)'s dual citizenship provision applies to alien corporations.

British Air asserts that its principal place of business is located in Harmondsworth, Middlesex, England. Blaney Aff. ¶ 4. It explains that all of British Air's "worldwide operations" and "[a]ll significant policy decisions" "are directed, controlled and coordinated out of its headquarters and principal place of business located at Waterside, Harmondsworth, Middlesex UB7 0GB." *Id.* ¶¶ 8-9.[5]

For their part, the plaintiffs do not dispute that British Air "has extensive operations in the United Kingdom and a large office in Harmondsworth," and that Harmondsworth "might well be the focus of Defendant's local U.K. business." Pls.'s Reply ¶¶ 12, 14 (ECF No. 9). But the plaintiffs point out that British Air conducts significant business in New York as well: its United States headquarters are located in New York; it owns substantial property in New York; it employs thousands of workers in New York; it has availed itself of New York courts as a plaintiff and defendant; it conducts many flights in and out of New York; and it derives large profits from its presence in New York. *See id.* ¶ 12.

The plaintiffs appear to be advocating for the court to determine the defendant's principal place of business by applying a sort of "business activities" test of the kind rejected by the Supreme Court in *Hertz Corp*. In adopting the "nerve center" test as the sole determinant of a corporation's principal place of business, the Court expressly rejected the "more general business activities test" that "measure[es] the total amount of business activities that the corporation conducts" in a state and deems that state to be the site of the corporation's principal

---

[5]   Indeed, based on my review, it appears that all courts that have confronted this issue have found British Air's principal place of business to be in the United Kingdom. *See Osborne v. British Airways PLC Corp.*, 198 F. Supp. 2d 901, 905 (S.D. Tex. 2002) ("British Airways's corporate and operational headquarters are in the United Kingdom and a large majority of its employees work there. As such, the Court finds that the United Kingdom is the domicile and principal place of business of the Defendant."); *Am. Express Travel Related Servs. Co., v. Marco*, 611 F. Supp. 938, 941 (D.C.N.Y. 1985) ("British Airways is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom, and the majority of its corporate shares are owned by the United Kingdom."); *Butz v. British Airways*, 421 F. Supp. 127, 131 (D.C. Pa. 1976) ("[T]he domicile and principal place of business of the defendant British Airways is in London, England . . . .").

place of business if the total business activities of that state "are "significantly larger than in the next-ranking State." *Hertz Corp*, 130 S. Ct. at 1193 (internal quotation marks omitted). Thus, if British Air's "nerve center" is in England, its principal place of business is in England – even if significantly more of its business operations take place in New York. I decline the plaintiffs' invitation for me to count up British Air's contacts in New York in conducting my "principal place of business" analysis, as it is expressly foreclosed by binding Supreme Court precedent. *See id.*

Alternatively, the plaintiffs' argument could be construed as advocating that an alien corporation should be deemed a citizen of whichever state the corporation's United States headquarters are located in. In other words, I should deem British Air to be a citizen of whichever state its principal place of business *within the United States* is located in, regardless of whether or not that office is British Air's *worldwide* principal place of business. Thus, even if British Air's worldwide principal place of business is in England, for purposes of § 1332(c) I should look to its principal place of business within the United States, which is New York.

In the first place, this argument violates the first tenet of *Hertz Corp* – that a corporation has only a single principal place of business. *Hertz Corp*, 130 S. Ct. at 1192. The argument's necessary upshot is that a foreign corporation may have *both* a worldwide principal place of business *and* a United States principal place of business.

Moreover, the Second Circuit has implicitly, if not expressly, adopted the view that a foreign corporation is a citizen of a state of the United States *if and only if* its worldwide principal place of business happens to be located in that state. *See Franceskin v. Credit Suisse*, 214 F.3d 253, 258 (2d Cir. 2000) (implicitly acknowledging that alien corporation would be considered citizen of a state in the United States if it maintained a principal place of business in

8

that state); *see also* 13F Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure § 3628 (3d ed. 2011) ("Wright & Miller") (advancing this interpretation of *Franceskin*). In fact, according to Wright & Miller, no court to have considered the application of § 1332(c) to alien corporations in a reported decision has adopted the construction urged by the plaintiffs here. *Id.* That is, of the courts that accept that §1332(c) applies to alien corporations, none insists that every alien corporation *necessarily must* have a principal place of business within the United States.

I therefore conclude for purposes of 28 U.S.C. § 1332 that British Air is a citizen of England and only England, and not a citizen of any U.S. state. Even assuming that § 1332(c) applies to foreign corporations, British Air's principal place of business is located in England, which is also its place of incorporation. Therefore, the parties are diverse: all plaintiffs are New York citizens, while British Air, the only defendant, is an alien. Because this court has jurisdiction based on the diversity of the parties, I need not consider whether the plaintiffs' complaint states claims that arise under the Montreal Convention, but do so for the sake of completeness.

B.          *Federal Question Jurisdiction*

The Constitution provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2. Congress bestowed this federal question jurisdiction on the federal courts in 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

9

The Montreal Convention, the successor to the Warsaw Convention,[6] governs "all international carriage by air of persons, baggage, or cargo." Montreal Convention, art. 1. "The cardinal purpose of the Warsaw Convention [which was superseded where applicable by the Montreal Convention] . . . [wa]s to achieve [international] uniformity of rules governing claims arising from international air transportation." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 169 (1999) (internal quotation marks and alterations omitted). The "complementary purpose of the Convention is to accommodate or balance the interests of passengers seeking recovery for personal injuries, and the interests of air carriers seeking to limit potential liability." *Id.* at 170.

Pursuant to Article 29 of the Montreal Convention,[7] rights under the Convention are exclusive, and its provisions "preempt[] all claims, whether based on federal or state law, that fall within its scope." *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp. 2d 361, 365 (S.D.N.Y. 2006). Accordingly, if recovery for personal injury covered by the Montreal Convention is not allowed under the Convention, it is not available at all. *Tseng*, 525 U.S. at 161; *see also Paradis v. Ghana Airways Ltd.*, 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004) (noting preemptive effect of Montreal Convention is "substantially the same" as that of Warsaw Convention).

---

[6] Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, *reprinted at* 49 U.S.C. § 40105. The Montreal Convention is "an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention." *Ehrlich v. American Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir.2004). The primary aim of its drafters was to "harmonize the hodgepodge of supplementary amendments and intercarrier agreements" that made up the Warsaw Convention. *Id.* (internal quotation marks omitted).

[7] Article 29 of the Convention provides that:
> [i]n the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

10

The Convention, however, has a rather limited scope. The Convention has three damage provisions: "(1) death or bodily injury suffered by an airline passenger or the destruction, loss of or damage to her baggage, provided the harm occurred onboard or in the process of embarking or disembarking (Article 17); (2) loss or destruction of baggage or other cargo sustained during carriage by air, subject to certain exclusions (Article 18); and (3) delay in the carriage of passengers, baggage or cargo (Article 19)." *Seagate Logistics, Inc. v. Angel Kiss, Inc.*, 699 F. Supp. 2d 499, 506 (E.D.N.Y. 2010) (citing *Weiss*, 433 F. Supp. 2d at 365). Thus, only passenger injuries that occur "on board the aircraft or in the course of any of the operations of embarking or disembarking" fall under the Convention. Montreal Convention, art. 17. "A carrier, therefore, is indisputably subject to liability under local law for injuries arising outside of that scope: *e.g.*, for passenger injuries occurring before any of the operations of embarking or disembarking," such as on a malfunctioning escalator in the airport terminal. *Tseng*, 525 U.S. at 171-72. Claims of non-performance of contract similarly fall outside the scope of the Convention. *See Seagate*, 699 F. Supp. 2d at 506 (collecting cases).

Based on the plaintiffs' complaint, a few of the plaintiffs' claims here could plausibly fall within the scope of the Montreal Convention: in particular, that Mr. Leichtag sustained physical injuries, Compl. ¶ 33; that Mr. Leichtag "suffers from serious back pain which causes travel in cramped economy class airplane seats to be extremely uncomfortable," *id.* ¶ 3; and that based on their appearance and request for Kosher meals, Mr. and Mrs. Leichtag were subject to "derogatory treatment and treated differently than it treated its non-Semitic customers," *id.* ¶ 38.

However, in their written submissions to the court in support of their remand motion, the plaintiffs here assert that their complaint should be construed to raise only claims

11

relating to "the airline's breach of contract in honoring its tickets and air miles program, and for the degrading treatment" they received at the airport terminal and over the telephone. Pls.' Remand Mo. ¶ 27; *see also* Pls.' Reply ¶ 32. The plaintiffs assure the court that their complaint does not purport to state a claim for "anything which occurred during the flight," in spite of the complaint's repeated mentions of Mr. Leichtag's discomfort in economy class on the flight. Pls.' Remand Mo. ¶ 27. Instead, the plaintiffs assert that "any mention of [Mr.] Leichtag's back problems was in the context of explaining . . . Brauner's motivations for gifting him and his wife first class plane tickets." Pls.' Reply ¶ 35. The plaintiffs assure the court that the complaint does not contain "any claim for any type of damages to [Mr.] Leichtag or anyone else which were incurred on the flight itself," and the plaintiffs raise claims only for "ordinary breach of contract" and tort for actions on the ground in New York. Pls.' Reply ¶¶ 33, 35.

In response to these assurances from the plaintiffs, British Air "concedes that[] if Plaintiffs are stipulating to the dismissal of all claims for physical and emotional injuries, discrimination, and derogatory treatment they allegedly sustained during the flight, the Montreal Convention would not govern any remaining causes of action solely based on allegations of non-performance." Def.'s Opp. at 2-3.

In light of the representations made by the plaintiffs that they are not pursuing claims for any injuries that occurred on, or while embarking on or disembarking from, the aircraft, the Montreal Convention is not implicated by the plaintiffs' claims. Accordingly, the plaintiffs' claims do not arise under federal law.

CONCLUSION

Because I conclude that this court has diversity jurisdiction over the subject matter of this action, the plaintiffs' motion to remand the action to state court is denied.[8]

So ordered.


John Gleeson, U.S.D.J.


Dated: April 12, 2012
       Brooklyn, New York

---

[8] Although the plaintiffs' counsel conceded at oral argument that the damages claimed in the complaint were overly aggressive, he makes no argument that the court lacks subject matter jurisdiction based on a purported failure of the claims to satisfy the amount-in-controversy requirement of 28 U.S.C. § 1332.